ROBERT R. POWELL, SBN 159747
SARAH E. MARINHO, SBN 293690
**POWELL & ASSOCIATES**
925 W. Hedding Street
San Jose, CA 95126
T: (408) 553-0201
F: (408) 553-0203
E: admin@rrpassociates.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(San Jose Division)

| | |
|---|---|
| MARINA ROCHES, individually and as heir to WALTER ROCHES, deceased, and the ESTATE OF WALTER ROCHES,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>COUNTY OF SANTA CLARA, JON QUIRO, EDWARD MEYERS, ADAM TORREZ, ALEXANDER MACDONALD, RYAN HERNANDEZ, ELMER WHEELER, THEODORE SHELTON, SHANE BOCANEGRA, JASON SATARIANO, ALBERTO LOAIZA, SEAN LOZADA, ARTURO PADILLA and DOES 1-100, inclusive,<br><br>                    Defendants. | Case No.<br><br>FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS<br><br><br>JURY TRIAL DEMANDED |

**INTRODUCTION**

1.      PLAINTIFF MARINA ROCHES, individually and as heir to Walter Roches, deceased, and the ESTATE OF WALTER ROCHES file this complaint for violation of civil rights after Walter Roches was killed by correctional deputies.

1

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

2.      Correctional officers employed by the County of Santa Clara regularly use excessive force on detainees in their custody.  The County has failed to properly train, supervise and discipline correctional officers for such conduct, and as a result there is a culture within the jail of repeated instances of excessive use of force.  The County also fails routinely to provide proper medical care to individuals in their custody.  Plaintiff's son, Walter Roches, had excessive force used on him and then was medically neglected while in the care of County of Santa Clara, resulting in his death, and Plaintiff now seeks damages for these violations of her and her son's constitutional rights.

## JURISDICTION

3.      The claims alleged herein arise pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

4.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

## VENUE

5.      Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) because the unlawful acts, practices and omissions giving rise to the claims brought by Plaintiff occurred in the County of Santa Clara, which is within this judicial district.

## PARTIES

6.      Plaintiff MARINA ROCHES was at all times herein mentioned, the mother of Walter Roches, a detainee in the Santa Clara jails in the custody of Defendant Santa Clara County. MARINA ROCHES is heir to the ESTATE OF WALTER ROCHES.  Plaintiff's son, Walter Roches, was arrested and booked into jail on September 5, 2015 and entered pleas of not guilty at his arraignment.  He later changed his plea on September 11, 2015, pursuant to a

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

negotiated disposition and was released on September 20, 2015.  Walter Roches was released without support or services, and was rearrested the same day and booked back into the main jail.  The next day, deputies used excessive force on him and the County employees were deliberately indifferent to his medical needs until he died on September 28, 2015.

7.     Defendant COUNTY OF SANTA CLARA (hereinafter "COUNTY") is a municipal corporation duly organized under the laws of the State of California.  Santa Clara County Department of Corrections ("DOC") is a subdivision of COUNTY, which operates three jail facilities: The Main Jail Facility, Elmwood Women's Correctional Complex, and the Elmwood Men's Correctional Complex.  COUNTY is responsible for ensuring that jail policies and practices do not violate individuals' substantive and procedural due process rights.

8.     At all times mentioned herein, Defendant ALEXANDER MACDONALD (hereinafter "MACDONALD") was employed as a correctional officer for defendant COUNTY. Defendant MACDONALD is sued individually and as a correctional officer for the COUNTY.  By engaging in the conduct described below, Defendant MACDONALD acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant MACDONALD exceeded the authority vested in him as a correctional officer under the United States Constitution and as an employee of the COUNTY.

9.     At all times mentioned herein, Defendant JON QUIRO (hereinafter "QUIRO") was employed as a correctional deputy for defendant COUNTY.  Defendant JON QUIRO is sued individually and as a correctional deputy for the COUNTY.  By engaging in the conduct described below, Defendant JON QUIRO acted under the color of law and in the course and

scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant JON QUIRO exceeded the authority vested in him as a correctional deputy under the United States Constitution and as an employee of the COUNTY.

10.     At all times mentioned herein, Defendant EDWARD MEYERS (hereinafter "MEYERS") was employed as a correctional lieutenant for defendant COUNTY.  Defendant MEYERS is sued individually and as a correctional lieutenant for the COUNTY.  By engaging in the conduct described below, Defendant MEYERS acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant MEYERS exceeded the authority vested in him as a correctional lieutenant under the United States Constitution and as an employee of the COUNTY.

11.     At all times mentioned herein, Defendant ADAM TORREZ (hereinafter "TORREZ") was employed as a correctional deputy for defendant COUNTY.  Defendant TORREZ is sued individually and as a correctional deputy for the COUNTY.  By engaging in the conduct described below, Defendant TORREZ acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant TORREZ exceeded the authority vested in him as a correctional deputy under the United States Constitution and as an employee of the COUNTY.

12.     At all times mentioned herein, Defendant RYAN HERNANDEZ (hereinafter "HERNANDEZ") was employed as a correctional sergeant for defendant COUNTY. Defendant HERNANDEZ is sued individually and as a correctional sergeant for the COUNTY.  By engaging in the conduct described below, Defendant HERNANDEZ acted under the color of law and in the course and scope of his employment for Defendant

COUNTY.  By engaging in the conduct described here, Defendant HERNANDEZ exceeded the authority vested in him as a correctional sergeant under the United States Constitution and as an employee of the COUNTY.

13.     At all times mentioned herein, Defendant ELMER WHEELER (hereinafter "WHEELER") was employed as a correctional sergeant for defendant COUNTY.  Defendant WHEELER is sued individually and as a correctional sergeant for the COUNTY.  By engaging in the conduct described below, Defendant WHEELER acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant WHEELER exceeded the authority vested in him as a correctional sergeant under the United States Constitution and as an employee of the COUNTY.

14.     At all times mentioned herein, Defendant THEODORE SHELTON (hereinafter "SHELTON") was employed as a correctional sergeant for defendant COUNTY.  Defendant SHELTON is sued individually and as a correctional sergeant for the COUNTY.  By engaging in the conduct described below, Defendant SHELTON acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant SHELTON exceeded the authority vested in him as a correctional sergeant under the United States Constitution and as an employee of the COUNTY.

15.     At all times mentioned herein, Defendant SHANE BOCANEGRA (hereinafter "BOCANEGRA") was employed as a correctional deputy for defendant COUNTY.  Defendant BOCANEGRA is sued individually and as a correctional deputy for the COUNTY.  By engaging in the conduct described below, Defendant BOCANEGRA acted under the color

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant BOCANEGRA exceeded the authority vested in him as a correctional deputy under the United States Constitution and as an employee of the COUNTY.

16.    At all times mentioned herein, Defendant JASON SATARIANO (hereinafter "SATARIANO") was employed as a correctional deputy for defendant COUNTY.  Defendant SATARIANO is sued individually and as a correctional deputy for the COUNTY.  By engaging in the conduct described below, Defendant SATARIANO acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant SATARIANO exceeded the authority vested in him as a correctional deputy under the United States Constitution and as an employee of the COUNTY.

17.    At all times mentioned herein, Defendant ALBERT LOAIZA (hereinafter "LOAIZA") was employed as a correctional deputy for defendant COUNTY.  Defendant LOAIZA is sued individually and as a correctional deputy for the COUNTY.  By engaging in the conduct described below, Defendant LOAIZA acted under the color of law and in the course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant LOAIZA exceeded the authority vested in him as a correctional deputy under the United States Constitution and as an employee of the COUNTY.

18.    At all times mentioned herein, Defendant ARTURO PADILLA (hereinafter "PADILLA") was employed as a correctional deputy for defendant COUNTY.  Defendant PADILLA is sued individually and as a correctional deputy for the COUNTY.  By engaging in the conduct described below, Defendant PADILLA acted under the color of law and in the

course and scope of his employment for Defendant COUNTY.  By engaging in the conduct described here, Defendant PADILLA exceeded the authority vested in him as a correctional deputy under the United States Constitution and as an employee of the COUNTY.

## FACTUAL ALLEGATIONS

**Correctional Deputies Use Lethal Excessive Force on Plaintiff's Son, Walter Roches, in Santa Clara County Main Jail**

19.     On September 21, 2015, Walter Roches was a detainee facing misdemeanor charges in the main jail of Santa Clara County, housed in 4B-1, cell 15.  Walter had been in the custody of the Sheriff's Office for the previous two weeks.

20.     Around 9:00 p.m. deputies assigned to his housing unit noticed that Walter was exhibiting odd behavior, so they submitted a mental health referral.

21.     32 year-old Walter was obviously in the midst of a mental health crisis.  Jail documentation from around this time indicated Walter had been progressively becoming mute, disheveled, and was refusing to shower.

22.     Around 9:45 p.m. a mental health staff member named Sara attempted to interview Walter through his cell door.  Walter remained lying prone on his bunk but told her that he was "sad and suicidal," causing Sara to place him on 15 minute checks for his own safety.

23.     Later, based on Sara's interaction with Walter, correctional staff in the Classification Unit advised 4th floor deputies that Walter should be rehoused to an observation cell in main jail south, 3rd East, so that he could be observed on 15 minute interval checks.

24.     Around 10:35 p.m., Correctional Officer ALEX MACDONALD informed Walter that he needed to be rehoused and ordered him to come to his door, and put his hands through the tray slot so that he could be handcuffed.  Walter remained lying shirtless, face down on his bunk, saying "I don't want to."

7

25.     Rather than simply open the cell door and escort Walter out, MACDONALD responded by spraying Walter with a chemical agent, Oleoresin Capsicum (OC), through the tray slot in the door.  The spray hit Walter on his head, face and shoulder, causing him to cough and moan due to the painful burning the chemical is intended to invoke.

26.     Although he was in physical and mental distress from his psychiatric crisis, exacerbated by the chemical agent in his eyes, Walter remained on the bed unable to help himself find relief or follow the commands from the deputies.

27.     MACDONALD determined that the OC spray seemed to have little effect on Walter, so he activated the Emergency Response Team (ERT), to come forcibly extract Walter from his cell.

28.     Correctional Sergeant RYAN HERNANDEZ responded to the housing unit and told Walter repeatedly to come to his door and get handcuffed through the tray slot so that they could decontaminate him.  Walter remained face down on his bunk and moaned quietly saying, "My eyes!  My eyes!  Ow!  They're burning!"  When HERNANDEZ repeated his command for Walter to come "cuff up," Walter moaned sadly, "go away, go away, go away."

29.     For a few minutes, HERNANDEZ robotically repeated, "Roches, come to the tray slot and cuff up so we can start the decontamination process."  Walter continued to moan in pain and remained on his bunk.  Suddenly, without any notice to Walter, HERNANDEZ opened the tray slot and sprayed Walter with pepper spray, causing Walter to cry out in pain and confusion.

30.     Walter continued to cough and moan in pain, but at no time did he get physically or verbally aggressive.

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

31.     Walter shifted so as to sit up on the edge of his bunk, hunched over.  He then stood

silently, his face, neck and shoulders wet and bright red from the pepper spray.  After almost

ten minutes of standing silently, Walter sat down on the stool which was affixed to the

concrete floor, where he sat silently for about ten more minutes.

32.     Throughout this time, HERNANDEZ continued to command robotically and

repeatedly: "Inmate Roches, come to the tray slot and cuff up so you can be decontaminated."

33.     Suddenly, the sound of boots marching in unison could be heard in the housing unit.

The militaristic and notoriously heavy-handed Emergency Response Team (ERT) arrived.

34.     On this evening, MACDONALD was the ERT leader.

35.      The other members of the team on this occasion were Correctional Deputy JON

QUIRO, armed with an FN 303 "less-lethal launcher;" Correctional Deputy ADAM

TORREZ, equipped with a large shield, approximately four feet long and almost two feet

wide; Correctional Deputy SHANE BOCANEGRA, armed with a baton; Correctional Deputy

JASON SATARIANO; Correctional Deputy SEAN LOZADA; Correctional Deputy

ALBERTO LOAIZA; and Correctional Deputy ARTURO PADILLA.

36.     ERT members marched in formation and TORREZ, BOCANEGRA, SATARIANO,

LOZADA and LOAIZA lined up in front of Walter's cell.  They were wearing full riot gear,

including full-face helmets, gas masks, knee pads, elbow pads and protective vests.

37.     Walter Roches was all of 5'6" in height.

38.     MACDONALD advised the ERT members that Walter was not acknowledging his

commands or communicating with him at all, and was just quietly sitting on his stool.

39.     Correctional Lieutenant EDWARD MEYERS was in 4B-1 during this incident and saw

that for 30 minutes the deputies had tried "several verbal attempts to gain compliance."

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

40.   MEYERS, the highest-ranking person on scene and the Watch Commander of the main jail, sprayed Clear Out into Walter's tiny cell, without giving any warning to Walter.

41.   MEYERS has described Clear Out as "another option to use if pepper spray doesn't work. . . it depletes the oxygen in the area so that the inmate has to comply so he can escape the effect of Clear Out."  In other words, it was suffocating.

42.   MEYERS also testified that he knew that Walter had reported feeling sad and suicidal, and that the reason he was being moved was so that 15-minute checks could be conducted for Walter's own safety.

43.   After MEYERS sprayed the Clear Out chemical agent, Walter remained seated on the stool, coughed and closed his eyes.  MACDONALD repeated his command: "Roches come to the door so we can begin the decontamination process."

44.   Two minutes after the first burst of Clear Out, MEYERS sprayed another burst of the chemical into Walter's cell.  Again, Walter remained silently seated on his stool, in a state of catatonia.

**Walter Roches Shot by Deputy QUIRO at Impermissibly Close Range With a Riot Gun**

45.   Less than one minute later, MEYERS, who is not a trained user in the FN 303 riot gun, gave the command for Walter to be shot with the FN 303 projectile launcher.

46.   The manufacturer of the FN 303 issues this warning for users of the weapon: "Use with extreme caution.  Misuse may result in injury or death."

47.   According to the County's Use of Force policy in effect on this date, deployment of the FN 303 is a Level IV use of force.  The only higher level of force is deadly force.

48.   The County introduced the FN 303 to the Department of Corrections armory around July 2009.

49.   The County did not update its policy entitled Use of Less Lethal Munitions to provide guidelines on the use, deployment and storage of the newly added FN 303 at the time it was added.

50.   The County merely advised that there was a new less lethal weapon, and that guidelines for its use will be addressed at the next policy amendment, and in the interim the device should be deployed in accordance with any training curriculum.

51.   At the time of the shooting of Walter Roches in September 2015, more than 6 years after it had been included in the County's armory at the jail, the County still had not updated its policy entitled Use of Less Lethal Munitions to provide guidelines on the use, deployment, and storage, of the FN 303.

52.   The manufacture describes the purpose of the FN 303 projectile on its website saying, "The primary effect of the projectile is trauma, which directly neutralizes the aggressor."

53.   MEYERS has testified under oath in another proceeding that he did not think Walter had been aggressive at all.

54.   MEYERS did not know, nor attempt to find out, the minimum distance at which a person could be "safely" shot with the FN 303, and testified that it is the ERT members who "are trained in exactly when and where it can be used, distance and whatnot."

55.   According to the FN303's manufacturer, it is sold as a military weapon used for prison riots in Iraq, and is accurate at distances up to 55 yards.

56.   The manufacturer recommendations, at the time of the incident, were that the FN 303 not be deployed at a person at a range shorter than 9 feet.

57.   The manufacturer further recommended, at the time of the incident, that the gun be aimed only at a person's thigh if it is being used at a distance of 9 to 12 feet.

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

58.   Plaintiff is informed and believes that Walter's cell #15 in 4B-1 measured approximately 12 feet deep by 6 feet wide.

59.   A small desk was attached to the rear of the cell, and the stool on which Walter was seated when shot with the FN 303 projectile, was bolted to the concrete floor in front of the desk, about three feet from the rear wall of the cell.

60.   JON QUIRO, who would eventually shoot Walter with the FN 303, testified in another proceeding that he did not know the depth of the cell because when he showed up at Walter's cell, he just "eyeballed" the distance from the tray slot to Walter, and determined it was far enough by "basically, kind of guesstimating, basically."

61.   Despite still being certified to use the FN 303 at the time of his testimony in 2017, QUIRO could not unequivocally state the minimum distance at which a person could be shot with the "less lethal" weapon, stating: "Minimum is -- it's either ten or 12 feet.  12 feet, I believe."

62.   At MACDONALD and MEYERS' direction, Correctional Deputy JON QUIRO approached the cell, placed the barrel of the FN 303 at the opening of the tray slot, and said, "Inmate Roches, I need you to come to the door and comply."

63.   Five seconds after giving the command, he shot Walter on his naked abdomen from a distance of approximately six to eight feet.

64.   QUIRO testified that he had aimed for Walter's abdomen.

65.   Walter, still in his catatonic state, hunched over a bit after the impact, but remained on his stool.

66.   MACDONALD ordered that he be shot again less than 30 seconds after the first shot.

67.   QUIRO then shot Walter two more times, about five seconds apart.

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

68.   The projectiles broke the skin, causing Walter to bleed.  At his autopsy, the coroner would find a huge bruise on his abdomen, measuring 12 inches by 7.5 inches.

69.   QUIRO testified that he had acted according to his training during the Walter Roches incident.

70.   Less than a minute after the third shot, MACDONALD unlocked the cell door and said, "Inmate Roches, this is your last chance," while simultaneously swinging the door opening and motioning for the ERT, who began charging into his cell.

71.   TORREZ, BOCANEGRA, SATARIANO, LOAIZA and LOZADA all stormed into the tiny cell.

72.   The five deputies tackled Walter and brutally took him to the concrete floor.

73.   In the process of "subduing" the catatonic Walter, they bloodied his nose, busted open his lip, and caused multiple contusions on his body from head to toe.

74.   Walter did not resist the deputies at all and remained quietly submissive during the entire interaction; again, he was "catatonic," defined as, "of or in an immobile or unresponsive stupor."

75.   It took the five deputies, crammed into the tiny cell in a dog pile on top of Walter, more than two minutes to get off of Walter and lift him to his feet.

76.   The deputies escorted Walter to the basement where they placed him in a shower, which they did only briefly, such that the chemicals that had sprayed all over his head and torso, left chemical burns to his skin.

77.   During the entire escort, one of the deputies cruelly and unnecessarily pressed the large shield against Walter's face, leaving it smeared with his blood.  Walter was quiet and stunned during the escort to the shower and while nurses checked his injuries.

78.   Yet, during the process described in the prior paragraph, MACDONALD kept repeating loudly for him to "comply."

79.   Walter was sent to Valley Medical Center and was returned to the jail hours later.

80.   The jail never notified Walter's emergency contact in his jail file of the incident or injuries.

81.   The jail never notified Walter's family members of the incident or injuries.

82.   The jail never notified Walter's criminal defense attorney of the incident or injuries.

83.   None of the individuals just noted were advised about his mental health crisis or hospitalization.

84.   Thereafter, with regard to the misdemeanor charges he was in jail on, the jail did not transport Walter to his court date on September 25, 2015.

85.   On September 28, 2015, Walter was supposed to have court at 1:30 p.m., but at 12:37 p.m. correctional deputies made a "man down" report saying that Walter was unresponsive in his cell.

86.   Walter had been laying in his cell naked, nonresponsive and making only gurgling sounds since at least the morning.  He was slowly dying a tortuous death.

87.   Walter was declared dead at 1:04pm.

88.   After a week of pain and unconscionable misery, Walter had died alone in his urine covered cell, forsaken by the people who had care, custody and control of him.

89.   An autopsy done on September 29, 2015, details the devastating injuries Walter suffered at the hands of the jail staff.

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

90.   The coroner's report indicated that Walter died of sepsis from an untreated urinary tract infection and untreated mental illness and found that the use of force by the deputies may have heightened and accelerated an already delirious state.

91.   Walter had multiple hemorrhages under his scalp, including one on the top of his head measuring 3 inches by 2.25 inches.

92.   Walter had a massive bruise on his mid and lower abdomen measuring 12 inches in width by 7.5 inches in height.  Around his navel there were three abrasions from the three projectiles shot from the FN 303.  The autopsy revealed that the injury extended into the underlying subcutaneous tissue and abdominal muscle.

93.   Walter had a large bruise and abrasion on his back measuring 11 inches by 3.5 inches.

94.   On his upper left chest, Walter had a large bruise measuring 4 inches by 3.25 inches. On his right chest, another bruise measuring 1.25 by 1.25 inches.  On his left leg, multiple bruises that measure 5 inches by 2 inches in aggregate.  On the top of his left foot, he had a large bruise measuring 4 inches by 4 inches.  Walter had bruises scattered over the rest of his body, including on his mid chest, upper left abdomen, right torso, both knees and arms.

95.   Walter was also covered in abrasions, including on his torso, legs, arms, hands and lower back.

96.   A toxicology test showed no alcohol or drugs of abuse in Walter's system.

97.   Plaintiff MARINA ROCHES, Walter's mother, was never notified of his death by the County, let alone informed of the brutal circumstances of the last week of his life, and had no reason to suspect that his death was caused by wrongdoing.

98.   Despite the brutal injuries found by the medical examiner during the autopsy on September 29, 2015, the official announcement publicized by the County was: "At this point

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

in the investigation, the autopsy of Mr. Roches did not disclose evidence of foul play or acute injury that would otherwise explain his tragic death.  The determination of the definitive cause and manner of death is expected to take weeks given the multitude of tests and studies ordered."

99.     Months later, on December 24, 2015, the medical examiner finally signed an official autopsy report indicating that the manner of death was "**Natural**" and the cause of death was "sepsis due to urinary tract illness complicating exhaustive mania due to untreated mental illness."

100.   Indeed, MARINA ROCHES did not find out about the horrifying circumstances surrounding Walter's death until October 4, 2017.  She still is unaware of the full extent of the ordeal he went through in his last weeks of life.

101.   It was only on October 4, 2017 that MARINA learned that Walter was in jail at the time of his death.

102.   It was only on October 4, 2017 that MARINA learned that force had been used on him shortly before his death.

103.   It was only on October 4, 2017 that MARINA learned that County employees DOES 1-10 had been deliberately indifferent to Walter's medical needs.

104.   On or about September 30, 2015, Walter's great-aunt in the United States who Walter had lived with and/or used as an emergency contact, called Walter's grandmother in El Salvador to tell her that Walter was dead.  MARINA ROCHES and her mother both fainted at the news and got disconnected from the great-aunt.  The great-aunt gave no details regarding the death and the women had no phone number to call her back.  Walter's mother has never owned a computer or used internet, email or Google.

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

105.  Ms. Roches does not speak English, so she could not call authorities to find out what had happened to Walter, and even if she could speak English, she would not have known who to call since she did not know he was even in Santa Clara County.

106.  Ms. Roches knew that Walter had suffered from substance abuse issues and mental health issues, so without any reason to suspect foul play, she surmised that he had died and early but natural or accidental death.

107.  If Ms. Roches had contacted the Santa Clara County Sheriff's Office, it is Sheriff's Office policy not to release incident reports or video, even to family members.

108.  The media submitted multiple requests to the jail for the records and videos under the California Public Records Act, which were denied.

109.  The details included in this complaint were obtained through counsel in other litigation against the County and are not publicly available, so Ms. Roches was not privy to them until she retained the undersigned.

110.  Had Ms. Roches attempted to obtain the death certificate for her son, she would not have been able to until at least December 24, 2015, when it was signed, and it would have shown that he died of natural causes, not putting her on notice of any injury to Walter (excessive force and deliberate indifference to medical needs) or herself (wrongful death and survivorship claims).

111.  On November 6, 2015, Walter's body arrived in El Salvador, having been shipped by a bay area funeral home which the County contracted with.

112.  The next day, November 7, 2015, MARINA ROCHES said goodbye to her son.

113.  Having never removed his clothing, she had no idea Walter was injured, nor that Walter's brain and spinal cord remained in Santa Clara County.

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

**Correctional Staff Failed to Protect Walter Roches From the Excessive Use of Force**

114.   Correctional Sergeant ELMER WHEELER was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.

115.   Correctional Sergeant THEORDORE SHELTON was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.

116.   Correctional Lieutenant EDWARD MEYERS was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.  As a supervisor, MEYERS acted in a manner that was deliberately indifferent to Walter's Eighth Amendment rights.

117.   Correctional Deputy JON QUIRO was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.

118.   Correctional Sergeant ALEXANDER MACDONALD was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.

119.   Correctional Sergeant RYAN HERNANDEZ was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.

120.   Correctional Deputy ADAM TORREZ was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.

121.  Correctional Deputy SHANE BOCANEGRA was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.

122.  Correctional Deputy JASON SATARIANO was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.

123.  Correctional Deputy ALBERTO LOAIZA was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.

124.  Correctional Deputy SEAN LOZADA was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.

125.  Correctional Deputy ARTURO PADILLA was present for the aforementioned excessive use of force on Walter, knew it was going to happen, and failed to prevent it or intervene once it was happening.

**The County Has a Policy, Practice and Custom of Excessive Use of Force and Failed to Properly Train Correctional Staff**

126.  Assistant Sheriff Troy Beliveau was at the time of Walter's beating and death a final decision maker in the Department of Corrections, and failed to enact policies, train staff, or maintain a culture and practice that ensures the people incarcerated in the jail are free from constitutional violations including the abuse, neglect, and death of Walter Roches.  MEYERS testified that after Walter Roches' death he discussed the cell extraction with Beliveau, and "I believe Captain Beliveau told me everything was done by the book."

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

127.  Beliveau allowed the inadequate or non-existent training to persist, a level of absence or inadequacy in training that exhibits deliberate indifference to the deficiencies and overt acts regularly occurring at that time and to present in the County jail system, which failures caused and/or were the moving force behind Walter's death.

128.  Sheriff Laurie Smith is a final decision maker in the Department of Corrections, and failed to enact policies, train staff, or maintain a culture and practice that ensures the people incarcerated in the jail are free from constitutional violations including the abuse, neglect, indignity and death of Walter Roches.

129.  On Sheriff Smith's watch, and due to her deliberate indifference, the FN 303 policy was never updated and the training was inadequate to prevent excessive force being used on individuals in County care, custody and control.

130.  Lieutenant Meyers, who was Watch Commander of the main jail on the night of the incident alleged in this complaint, and was present for the forceful cell extraction, determined that it was all done according to policy.  If correct, the policy is a testament to deliberate indifference to the rights and safety of jail inmates, and this is particularly so with regard to jail inmates suffering mental health issues such as Walter.

131.  Captain Blanca Hoyt, who was Facility Commander of the main jail at the time of the incident alleged in this complaint and for several years prior, testified in another proceeding she reviewed the video of the Walter Roches forceful cell extraction and thought it was done pursuant to policy.

132.  Hoyt testified that at the time of Walter's shooting, there was no policy that required staff to inform the Facility Commander prior to using the FN 303.

133.  Hoyt also testified that Captain Tim Davis was assigned to look into whether the FN 303 was used appropriately, and he concluded that it was.

134.  Internal Affairs nor any outside agency ever looked into the use of force on Walter.

135.  No correctional staff was ever disciplined as a result of the use of force on Walter.

136.  At the time of Walter's autopsy, the Coroner's Office was overseen by the Sheriff's Office.

**The Sheriff's Office Has a Practice of Improperly Pressuring the Medical Examiner and Influencing the Outcome of Investigations of In Custody Deaths, Including that of Walter Roches, in Order to Fraudulently Conceal the Injury**

137.  The deputy coroner who wrote the autopsy report testified under oath that she felt pressured many times by the Sheriff's Office to make certain findings in her investigations and that there was a conflict of interest and no ethical wall between the offices.

138.  The coroner's concerns were so great that the Board of Supervisor's voted to separate the Coroner's Office from the Sheriff's Office so that investigations into in-custody deaths would be neutral and independent.

139.  Plaintiff is informed and believes that Sheriff Laurie Smith and/or one of her next-in-command pressured the deputy medical examiner to make the official manner of death "natural."

140.  Any neutral medical examiner would have found that Walter Roches' death was a homicide.

**Walter Roches was Subjected to Cruel and Unusual Conditions of Confinement, Which Led to His Death.**

141.  During Walter's time in the County jail, Walter was isolated in a tiny cell for 23 to 24 hours of every day, without receiving out-of-cell time that he is entitled to under state law.

142.  During Walter's time in the County jail, Walter was regularly forced to sit idle locked in his small cell for 47 hours at a time.  This isolation is inhumane, especially for people like Walter who suffer from preexisting mental health conditions and are likely to experience serious psychological and physiological harm as a result of these COUNTY practices.

143.  It is unknown to Plaintiff at this time if the isolation that occurred with Walter is literally a policy of the County, which would be deliberately indifferent on its face, or a practice and custom of the County, though equally deliberately indifferent if either.

144.  This denial of environmental stimulation and basic necessities of life is unacceptable in a civilized society for any inmate, but it is notable that at the time of his assault and death Walter Roches was a pretrial detainee who was not serving a sentence and was presumed innocent.

145.  Despite coming into County custody from a transitional home for the mentally ill that contracts with the County and which County jail medical personnel know well, and, having recently documented urinary tract infections and medication management issues for his psychiatric diagnosis at the transitional home, the jail medically neglected Walter once he came into their custody, and did not treat, or did not assess or treat adequately, Walter's mental health and recurring urinary tract infection issues.

146.  Plaintiff is informed and believes that the County has a policy, practice, or custom that includes not immediately obtaining physically, or obtaining access to, all medical records of inmates such as Walter upon their admission to jail  - or timely thereafter, a policy, practice or custom which is also deliberately indifferent to the rights and safety of inmates such as Walter.

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

## DAMAGES

147.   As a proximate result of Defendants' conduct, Plaintiff's son suffered severe pain, physical injuries, and prolonged suffering until he died.  As a further proximate result of Defendants' conduct, Walter Roches suffered severe emotional and mental distress, fear, terror, anxiety, depression, humiliation, embarrassment, and loss of his sense of security, dignity, and pride.

148.   Plaintiff has lost her liberty interest in the companionship and familial association with her son.

149.   The conduct of the individual Defendants was malicious, sadistic, wanton, and oppressive.  Plaintiff is therefore entitled to award of punitive damages against the Defendants.

## CLAIMS FOR RELIEF

### First Cause of Action
### (Fourteenth Amendment – Excessive Force - Cruel and Unusual Punishment, 42 U.S.C § 1983)
### (Against Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, BOCANEGRA, SATARIANO, LOAIZA, and LOZADA)

150.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

151.   In doing the acts complained of herein, Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, BOCANEGRA, SATARIANO, LOAIZA, and LOZADA, acted under the color of the law to violate Walter Roches' basic human dignity and his right to be free from cruel and unusual punishment under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including the right of pretrial detainees to be free from the use of excessive force by correctional deputies and other government actors.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).

152.   As a proximate result of defendants' malicious and sadistic conduct, Walter Roches suffered injuries and damages as set forth in paragraph 147-148.  The punitive damage allegations of paragraph 149 apply in this Claim for Relief to all individually-named Defendants.

**Second Cause of Action**
**(Fourteenth Amendment – Failure to Protect - Cruel and Unusual Punishment, 42 U.S.C § 1983)**
**(Against Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and PADILLA)**

153.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

154.   In doing the acts complained of herein, Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and PADILLA, acted under the color of the law to violate Walter Roches' basic human dignity and his right to be free from cruel and unusual punishment under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, including the right of pretrial detainees to be free from the use of excessive force by correctional deputies and other government actors.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).

155.   Defendants were deliberately indifferent to Walter Roches' Due Process rights when they failed to protect him from excessive use of force by their colleagues, and instead stood by and watch it happen.

156.   Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and PADILLA had actual knowledge of the danger to Walter Roches, failed to take reasonable

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

steps to protect him, and Walter's injuries were proximately caused by Defendants' failure to take those steps.

157.   As a proximate result of defendants' malicious and sadistic conduct, Walter Roches suffered injuries and damages as set forth in paragraph 147-148.  The punitive damage allegations of paragraph 149 apply in this Claim for Relief to all individually-named Defendants.

**Third Cause of Action**
**(Fourteenth Amendment – Medical Neglect - Cruel and Unusual Punishment, 42 U.S.C § 1983)**
**(Against Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and PADILLA and DOES 1-100)**

158.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

159.   In doing the acts complained of herein, Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and PADILLA, and DOES 1-100 acted under the color of the law to violate Walter Roches' basic human dignity and his right to be free from cruel and unusual punishment under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, when they failed in their duty to provide prompt and adequate medical attention to Walter Roches.

160.   Defendants were deliberately indifferent to Walter Roches' Due Process rights when they breached their duty, because they knew or should have known that Walter was in immediate need to medical care.

161.   Defendants breach of duties in this regard resulted in further injury, pain, suffering and death of Plaintiff's son, Walter Roches.

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

162.   As a proximate result of defendants' malicious and sadistic conduct, Walter Roches suffered injuries and damages as set forth in paragraph 147-148.  The punitive damage allegations of paragraph 149 apply in this Claim for Relief to all individually-named Defendants.

**Fourth Cause of Action**
**(Eighth Amendment – Excessive Force - Cruel and Unusual Conditions of Confinement, 42 U.S.C § 1983)**
**(Against Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, BOCANEGRA, SATARIANO, LOAIZA, and LOZADA)**

163.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

164.   In doing the acts complained of herein, Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, BOCANEGRA, SATARIANO, LOAIZA, and LOZADA, acted under the color of the law to violate Walter Roches' basic human dignity and his right to be free from cruel and unusual conditions under the Eighth Amendment to the United States Constitution, including the right of sentenced inmates to be free from the use of excessive force by correctional deputies and other government actors.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Resnick v. Hayes*, 213 F.3d 443, 447-48 (9th Cir. 2000)(prisoner who has been convicted but not yet sentenced should be treated as sentenced prisoner, rather than pretrial detainee).

165.   As a proximate result of defendants' malicious and sadistic conduct, Walter Roches suffered injuries and damages as set forth in paragraph 147-148.  The punitive damage allegations of paragraph 149 apply in this Claim for Relief to all individually-named Defendants.

//

//

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

**Fifth Cause of Action**
**(Eighth Amendment – Failure to Protect - Cruel and Unusual Conditions of Confinement, 42 U.S.C § 1983)**
**(Against Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and PADILLA)**

166.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

167.   In doing the acts complained of herein, Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and PADILLA, acted under the color of the law to violate Walter Roches' basic human dignity and his right to be free from cruel and unusual conditions under the Eighth Amendment to the United States Constitution, including the right to be free from the use of excessive force by correctional deputies and other government actors.

168.   Defendants were deliberately indifferent to Walter Roches' Eighth Amendment rights when they failed to protect him from excessive use of force by their colleagues, and instead stood by and watch it happen.

169.   Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and PADILLA had actual knowledge of the danger to Walter Roches, failed to take reasonable steps to protect him, and Walter's injuries were proximately caused by Defendants' failure to take those steps.

170.   As a proximate result of defendants' malicious and sadistic conduct, Walter Roches suffered injuries and damages as set forth in paragraph 147-148.  The punitive damage allegations of paragraph 149 apply in this Claim for Relief to all individually-named Defendants.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Sixth Cause of Action**
**(Eighth Amendment – Medical Neglect - Cruel and Unusual Conditions of Confinement,**
**42 U.S.C § 1983)**
**(Against Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ,**
**SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and**
**PADILLA and DOES 1-100)**

171.  Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

172.  In doing the acts complained of herein, Defendants MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and PADILLA, and DOES 1-100 acted under the color of the law to violate Walter Roches' basic human dignity and his right to be free from cruel and unusual conditions of confinement under the Eighth Amendment to the United States Constitution, when they failed in their duty to provide prompt and adequate medical attention to Walter Roches.

173.  Defendants were deliberately indifferent to Walter Roches' Eighth Amendment rights when they breached their duty, because they knew or should have known that Walter was in immediate need to medical care.

174.  Defendants' breach of duties in this regard resulted in further injury, pain, suffering and death of Plaintiff's son, Walter Roches.

175.  As a proximate result of defendants' malicious and sadistic conduct, Walter Roches suffered injuries and damages as set forth in paragraph 147-148.  The punitive damage allegations of paragraph 149 apply in this Claim for Relief to all individually-named Defendants.

//

//

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

**Seventh Cause of Action**
**(Fourteenth Amendment – Right of Familial Association, 42 U.S.C § 1983)**
**(MARINA ROCHES Against Defendants MEYERS, MACDONALD, QUIRO,**
**HERNANDEZ, TORREZ, BOCANEGRA, SATARIANO, LOAIZA, LOZADA, and**
**DOES 1-100)**

176.  Plaintiff incorporates by reference each and every allegation contained in the preceding

paragraphs as if set forth fully herein.

177.  In doing the acts complained of herein, Defendants MEYERS, MACDONALD,

QUIRO, HERNANDEZ, TORREZ, BOCANEGRA, SATARIANO, LOAIZA, LOZADA,

and DOES 1-100 acted under the color of the law to violate MARINA ROCHES' right of

familial association with her son Walter Roches under the Fourteenth Amendment to the

United States Constitution when they denied him his basic human dignity and his right to be

free from cruel and unusual punishment, resulting in his death.

178.  As a proximate result of defendants' malicious and sadistic conduct, MARINA

ROCHES suffered injuries and damages as set forth in paragraph 147-148.  The punitive

damage allegations of paragraph 149 apply in this Claim for Relief to all individually-named

Defendants.

**Eighth Cause of Action**
**(*Monell* Liability - Eighth Amendment and Fourteenth Amendment – Cruel and**
**Unusual Punishment, 42 U.S.C. §1983)**
**(Against Defendant COUNTY)**

179.  Plaintiff incorporates by reference each and every allegation contained in the preceding

paragraphs as if set forth fully herein.

180.  From the time MARINA ROCHES' son, Walter Roches, was booked into County jail

on September 5, 2015, until he was sentenced on September 11, 2015, he was a pretrial

detainee whose conditions of confinement amounted to punishment in violation of the Due

Process Clause of the Fourteenth Amendment.  Following his sentencing and until his release

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

on September 20, 2015, his conditions of confinement were cruel and unusual under the Eighth Amendment. When he was arrested that same day on a misdemeanor violation of probation, until he died on September 28, 2015, he was a detainee because he was never arraigned.

181. The COUNTY, by and through its supervisory officials and employees, has been given notice on repeated occasions prior to the excessive force used on Walter Roches, of a pattern of ongoing constitutional violations and practices by the individually-named Defendants herein and other correctional deputies employed at the COUNTY Main Jail and other jails in the COUNTY jail system, including having received notice regarding the use of excessive force, and cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

182. These policies and practices have been and continue to be implemented by Defendants, such as the harassment and excessive use of force suffered by Walter Roches at the hands of MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and PADILLA, are the proximate cause of the Plaintiff's ongoing deprivation of rights secured under the Eighth Amendment. The force used by MEYERS, MACDONALD, QUIRO, HERNANDEZ, TORREZ, SHELTON, WHEELER, BOCANEGRA, SATARIANO, LOAIZA, LOZADA and PADILLA was not a good faith effort to maintain or restore order, but was applied maliciously and sadistically for the very purpose of causing harm.

183. COUNTY, by its policy and practice of isolating people in inhumane conditions referenced above, is subjecting individuals, including Plaintiff, to serious psychological and physiological harm. Jail officials have consistently denied or ignored Plaintiff's and others

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

written requests to be removed from isolation or to have access to at least the minimum out of cell time guaranteed by law.  This amounts to a serious deprivation of the minimal civilized measures of life's necessities.

184.   Despite said notice, Defendant COUNTY has demonstrated deliberate indifference to this pattern and practice of constitutional violations, having shown deliberate indifference, by failing to take necessary, appropriate, and/or adequate measures to prevent the continued perpetuation of said pattern of conduct by their employees and agents. This lack of an adequate supervisorial response by Defendant COUNTY demonstrates the existence of an informal custom, policy, or practice, which tolerates and promotes the continued violation of civil rights of inmates by COUNTY's employees and agents.

185.   Plaintiff is informed and believes that in addition to these long standing practices and customs, the COUNTY has failed to provide adequate training, or no training at all, on the obligations of COUNTY correctional deputies to not engage in excessive force, and to conduct themselves as professionals charged with not only ensuring the completion of an inmate's criminal sentence, but the safety of inmates as well.

186.   The acts of the individually-identified Defendants alleged herein are the direct and proximate result of the deliberate indifference of Defendant COUNTY and its supervisory officials and employees to violations of the constitutional rights of inmates by the individually-named Defendants and other correctional deputies.

187.   The COUNTY has failed to adequately seek out or stop such sadistic behavior as alleged herein by failing to investigate claims of excessive force, and further failing to adequately discipline, punish, or expel correctional deputies who have engaged in the aforementioned and/or similar conduct when handling inmates.

188.   The COUNTY has either provided no training at all in regards to appropriate handling, treatment, and protection of inmates, or has received wholly inadequate training with no measurable standards, or no measuring, of the training recipients understanding, retention, and application – or non-application – of training materials and subject matter.

189.   COUNTY also knew or should have known that Walter Roches needed medical care, and failed to ensure that he was treated promptly, resulting in his death.

190.   Walter Roches' injuries and death were a foreseeable and a proximate result of the deliberate indifference of the COUNTY to the constitutional violations taking place in the COUNTY Main Jail and jail system, existing as a result of the patterns, practices, customs and/or policies, and/or lack of training or non-existent training, described above.

191.   As a proximate result of COUNTY's conduct and omissions, Walter Roches suffered injuries and damages as set forth in paragraph 147-148.  The punitive damage allegations of paragraph 149 apply in this Claim for Relief.

## PRAYER FOR RELIEF,

WHEREFORE, Plaintiff respectfully request that this Court:

1.)     Award Plaintiff general, special and compensatory damages in an amount to be proven at trial.

2.)     Award Plaintiff punitive damages against individually named Defendants, and each of them, for their extreme and outrageous conduct in complete disregard for the rights of the Plaintiff;

3.) Award Plaintiff statutory damages and/or attorney's fees against all Defendants as allowed by 42 U.S.C. §1988.

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.

5.) Grant Plaintiff such other and further relief as the Court deems just and proper.


Dated: March 27, 2018                                    /S/ Sarah E. Marinho
                                                        SARAH E. MARINHO
                                                        Attorney for Plaintiff


JURY DEMAND:  Plaintiff demands a trial by jury in this matter, pursuant to FRCP 38(a).


Dated: March 27, 2018                                    /S/ Sarah E. Marinho
                                                        SARAH E. MARINHO
                                                        Attorney for Plaintiff

First Amended Complaint for Violation of Civil Rights
Marina Roches v. County of Santa Clara, et al.